Next case on the calendar today is No. 16, 1474, Flores Anyosas v. Sessions. Why don't you give them a minute for people to clear. All right, Mr. Isaacson. May it please the Court, my name is David Isaacson. I represent Petitioner Carlos Augusto Flores Anyosa. There are three main issues on which the agency erred in this case. The order in which we treat them doesn't matter that much, but I'll start with well-founded fear, where I believe the agency reached an egregiously erroneous conclusion based on multiple instances of flawed reasoning and misunderstanding of the record. I think we have to start with the basic standard for a well-founded fear, which, according to this Court's case law, is a relatively low bar. It's been described in various terms in cases like Tianyong Chen and Cursu Artun and Carranza Hernandez. Would a reasonable person be afraid? Is there a slight but discernible chance of persecution? The Supreme Court in Cardozo-Fonseca said 10 percent is enough. Whichever of those formulations you use on the facts of this case, where someone has credibly testified that you have a known murderous gang, from whom an expert who is also credible believes they are in danger, who has attacked and sought to break into their house and sent them repeated death threats, I think the idea that a reasonable person would not be afraid under those circumstances The issue the agency went on is not that there wasn't a gang, but that the presence of a gang and even fear of a gang isn't a ground for defeating or removal unless there's some indication the police are indifferent to it or encourage it. I can certainly jump to that third issue, Your Honor. I had thought they also believed that his fear wasn't well-founded, but I can certainly jump to the unable or unwilling to prevent issue. Let me ask one quick question about the well-founded fear. How should we deal with the passage of time? The events here occurred in 2011. It's now 2018. I guess the IJA made its decision three years later. We have the expert report about the pervasiveness of gangs, including Los Norteños in Peru, but still, unlike some of the immutable characteristics in which we've dealt with prior asylum cases, this seems maybe passing. Is there still or do we need to find that there's still a well-founded fear of persecution? I think we need to find that there at least was still at the time of the immigration judge's decision. I think the issue of a record of time passing since a record was created is one that's unfortunately unavoidable in a prolonged system of appellate review and doesn't get held against my client. But I think what we need to find, again, goes back to that low bar. We only need to find that as of the immigration judge's decision, a reasonable person would still be afraid. And when the only reason that the gang stops threatening you is that they find out that they learned that I took off, as he testified at AR 140, and since, as we've explained in the briefs, this is at least predominantly only an armed gang in Peru. I think there's one instance in the record that we didn't catch when briefing of a robbery in Bolivia, which the court can take notices right next to Peru. But there's no evidence that they called after that, right? That they were trying to figure out when he's coming back? Is he coming home for Christmas? Is he going to return to Peru? Well, there were calls to a point, and then they learned that. 2012. Yeah, and then they learned that he took off, and they — How did they learn he took off? So — That's just your client's saying. That's my client's phrasing. One of the issues here is — But how does he know that they learned that? Well, since his testimony was found credible, I think if the government had wanted to cross-examine further on the question of whether — of how he knew the time to do that would have been in the proceedings before the agency, I think it would have — perhaps, as Your Honor says, it would have been open to the judge, the immigration judge, to say that there was some issue with his credibility as to that assertion. But the judge didn't say that. Well, I mean, he didn't offer any basis as to what was the source of it, or what was the basis for his conclusion, right? It's certainly, I would say, implicit in the record. He did testify, as we pointed out in a slightly different context, that these gang members are in his immediate area, are well-known criminals in his area. Some of them are just blocks away. I don't think it takes a great leap of surmise to see how people just blocks away would have learned that he had fled, and that may be why the government chose not to explore the issue further on cross-examination below. Once he has credibly testified to this, I think that it becomes part of the factual record. It's not something that we can now say that we disagree with. As the Third Circuit, in a case we cited, cautioned that the court has to be careful to, or the agency, rather, has to be careful to correctly represent what the credible respondent has testified to. And I think this court has also held similarly. The issue with respect to unable or unwilling to prevent, I think there are a few errors that were made here by the agency. One is this reasoning error that we highlighted in our brief that later comes up in Rosales-Justo, where the Court of Appeals for the First Circuit also says you can't conflate unable and unwilling. There are certainly reasons to think they may be unwilling. They were given this information and didn't do anything. There's certainly speculation about the motive, whether political or being paid off for corruption. But even if one thinks that the corruption was slightly reduced, that doesn't go to the idea that they're somehow more able. There's very blurred language. Yes. I mean, they responded to his call to the police, or his mother's call to the police, correct? They came and took a report. They came to his house, correct? They took a report, yes. And they took photographs. Yes. And said they were going to investigate. Yes. And that's the last communication he ever had with anybody there, right? And then what he has, again, credibly testified is that they had, that he gave information as to the whereabouts of the Bandilos Nortenos. They knew where to find them, and they never did. What does that mean? So if I called the NYPD and said, I know who threw a rock through my window. You should arrest them. And they don't. Then that means the NYPD is unwilling or unable to investigate? I think it's one fact in the pattern. I think when you have that against the background of background materials that specifically say that they're often unable to respond to calls for service, incapable of proactively deterring and investigating crimes, according to many crime victims, police merely go through the motions when taking crime reports, are incapable or unwilling in most instances to conduct meaningful investigations, and rarely arrest perpetrators. That's 400 to 401. But it seems to me you're basically saying then any case involving Peru doesn't get a case-by-case analysis. We just presume that they're incompetent and incapable. No, I'm saying both of these things are relevant factors pointing in the same direction. I'm saying the case-by-case analysis goes to the fact that he gave them the whereabouts, and they didn't do anything with them. How do you know that? Again, he's testified credibly to this. Catch them? It doesn't take it. I'm sorry, Your Honor, I didn't mean to interrupt. You say, well, I asked you how do you know they didn't do anything, and I'm wondering is the answer because they didn't catch them? Not just that, because they didn't catch them knowing where they were, having been told where they were. And, again, he's credibly testified to this, and he had an obvious way of knowing it, which the government could have explored further on cross-examination. He was asked have you or your stepfather followed up in regard to the complaints. His answer was no. Yes. He hasn't gone back to the police who he thinks gave away this information to the gang who didn't come and follow up with him, to whom he gave the information about where the gang members were, and these are gang members that are close by in his neighborhood. So, again, it doesn't take a great leap of imagination to see how he would have known that they were still at liberty in his neighborhood, especially because he was also still getting phone calls from them. How many times did the police come to the home? I believe it was only the one time that they came and took the photographs. Hadn't they come before that in response to a call? Well, it depends which investigation we're talking about. They had come previously, I believe, when he was reporting, although I'd have to double-check the record to be sure. I don't want to misrepresent. But when he was reporting the initial crime, there was certainly interaction with the police, the crime to which he was a witness. They came and took a report then as to the attack on the house. But the attack on the house, I think, is the major incident. Also, by the way, as to past persecution, which I can address further if Your Honors would like, where the question is, as a mixed question of law and fact with de novo review, do these facts establish past persecution? They took photos of the damage? Yes. They took photos of the damage. The IJ mentioned that. The BIA didn't rely on that, perhaps because that doesn't seem very different than merely taking a report, which is what had happened in O.Z. and I.Z. and in Aliyev. In this case, the report did come with some photographs. But where he's credibly testified that he gave them information about where to find these perpetrators, and they never did, and where the background material But he didn't even see the perpetrators, right? His testimony was he didn't see it. He was in a different room. He saw that there were rocks thrown through windows. But when I say perpetrators, he had seen, remember, the burglaries, his friend's friend, and he saw this all started. He saw one person at the burglary. Yes. But if one member of a known gang threatened, if a gang threatens you for witnessing a crime against one of their members, and you know that there were multiple people breaking into your house, it again, I think, doesn't take a great leap of surmise to suppose that the people threatening you for reporting against the known gang member are members of that same gang. I just want to be clear. So if I get assaulted by a member of the Hells Angels, and then later, after I talk to the police, somebody throws bricks through my window and says they're going to mess me up, and I say the Hells Angels hang out at this bar on 7th Avenue, go arrest them. Do you think that would be enough for the police to go do that? I think if a known Hells Angel had committed the burglary, and if the threats didn't just say, I'm going to mess you up, but says, we know you went to the police, we know you're a snitch. That would give you probable cause, you think, to arrest somebody at the 7th Avenue bar? I think, I have to admit I'm not as acquainted with the details of the Hells Angels, but if the Hells Angels are a known gang that murders people and commits these various crimes as the credible expert testimony is. That would be enough to arrest them. In Peru, that would be enough to arrest, do you think? I think if you're a member of a known criminal organization where people have threatened someone with death, and not just threatened, by the way, attacked the house in a way that I think this goes to imminence of threat on the past persecution question. No, I think we're switching. We're jumping from question to question. Sorry. Okay. I'm sorry, Your Honor. I think that on the background of this case, where the threats and the attack specifically referenced the crime that you had witnessed being committed by a member of this gang in your area, at the very least it would be a reason to go arrest that person who instigated the threats against you since they referenced your snitching on him. Whether it would be a reason to arrest other members of the same gang, at least for further investigation, I would think so, but I don't think you even need to get that far. We at least know as to this initial perpetrator. You could infer that the individual who did the robbery is also the individual who threw the rocks. Or is at least involved in causing the rocks to be thrown, given that the rocks that are for reporting against the crime committed by the initial gang member. Did he call the police to say they're still calling me? They're calling every day or every other day. Did he call the police to advise them of that? So when he called about the initial November 15th threat, he would have advised them, I think, of the previous threats. Would have? In other words, yeah, when he reported it. What does the record say? In other words, the record says that he called to report this incident which came with the threats. I don't know that it goes into detail about exactly which of the prior threats he reported, but we know that he reported this major November 15th incident. And there were calls after that too? There were calls after that. And did he report those to the police? I think there were not separate reports, and the police also, as he said, did not come to follow up with him. He had left by then, hadn't he? What? He had left by then, hadn't he? For some of the calls, I think what His Honor may have been referring to is there was an was attacked, rather. There was an interval between when his house was attacked and when he departed, during which he essentially remained in hiding, because at that point it had become apparent that they had detailed information about his whereabouts that they had not revealed before, the threats after November 15th being more detailed. Mr. Isaacson, before you sit down, I'd like to ask you another question. I was struck by the absence of discussion of the nexus requirement, that the IJ assumed that there was such a nexus and there was a social group of involuntary informant. And I wondered what you have to say about the Attorney General's recent decision in matter of AV, which seems to cast doubt on the validity of asylum claims. They're predicated on gang-related persecution and such a mutable characteristic in group as you would be relying on here. If we were to agree with you otherwise, wouldn't we still need to ask the BIA to take a look at the application of matter of AB first? I think not only the BIA, but I think it would have to go back to the IJ if there were a remand, because there would need to be further fact-finding if the agency wanted to apply the new rubric to the extent it is a new rubric. Matter of ARCG, which AB overturned, pertained to domestic violence and not gang cases. So there is an open question, as I had mentioned in the 28J letter in the other context of unable or unwilling to prevent, there's an open question of the extent to which AB is altering the law rather than sort of tendentiously restating it as to questions other than that. But AB makes some fairly broad pronouncements about the nature of particular social groups that would support such a claim as your client is making. No, it certainly does. And I agree that it may be open to the agency on remand to readdress that issue. I do think that because the immigration judge found in our favor, used the word assumed, it's arguably an assumption. He then goes into some detail in the footnote about why it seems likely that we may have met that requirement. But I agree. He does use the word assumed. So that may be a basis to remand to the immigration judge and have the immigration judge reexamine his assumption in light of the new case law, although there's also an issue, as we mentioned in our 28J letter, of whether that new case law would apply retroactively. But all of those are issues that might be open to the agency on remand. They're not, I think, open as a basis for sustaining the agency's decision under Chenery because they're not something that the agency relied on below. And in fact, when the government cited AB in its 28J letter, it only cited it on the unable or unwilling to prevent point. So evidently even the government doesn't think that this court can kind of go back down to something that the immigration judge at least assumed in our favor in that footnote and say instead, you know, that we would lose on that point. I agree it might be an issue open for further analysis. We'll hear from the government. Okay. Thank you. You have three minutes for rebuttal. Mr. George. Thank you, Your Honor. May it please the court, Matthew George for the Attorney General. This case is about the inferences and extrapolations that may or may not be drawn from the evidence in this case. If we look at the actual record evidence, it's not anywhere near as extent as Petitioner is baking it out to be. For example, with respect to the phone call stopping in July 2012, Petitioner did first testify that they stopped because they learned that I took off. And this is at page 140. He then said, I don't know if their interest is gone for me. Things change. Another relevant point is that no one has ever followed up with the police after at least three encounters with them. First, when they came to his house after the initial robbery when he was identified as a witness. Second, when he went to the police station and filed a report after the first threatening note he received. And then third, after the window breaking incident when the police came to his house and took pictures and did a report and investigation and so on. The IJ seemed to take amiss that Mr. Flores-Segnosa hadn't followed up after he got into the United States. And I found that a little surprising that you'd expect having felt, as he credibly said that he did, that he felt persecuted and threatened by this ongoing behavior which the police had not put a stop to while he was in country. Why would he necessarily make a call or go back to see if they had arrested those who had perpetrated that harassment? Yes, Your Honor. It's certainly not his burden or obligation to follow up. We just simply don't have that evidence in this case. And that's what the agency is pointing to here. We just don't know what the police did. Petitioner left approximately a month after the rock throwing incident. So we don't know what the police did. But he testified credibly that he was hiding in his house during that time. He lost his job or quit his job and felt, based on, I mean, we saw some documentary evidence and other photographic evidence that he had, in fact, been the subject of some fairly aggressive harassment and threats. Surely we don't have to wait for the threats to be fulfilled for him to find that he had a well-founded fear of persecution. And he was in contact, you know, periodically with the police while he was there, yet the threats continued. So what more should he have been doing? Well, all of this kind of goes to that question. All we have are unfulfilled threats, which this court and many others say you need more than unfulfilled threats. It was not just the words. I mean, there was an aggression on his house that was fairly destructive. Right. And we're not saying that wasn't intimidating or harassing or uncomfortable or unpleasant or anything like that. However, it doesn't amount to persecution, and it doesn't give rise to the level of persecution in terms of a well-founded fear. Because it's not aggressive enough? Correct. There's no physical harm. I mean, this was just an act to intimidate, and nothing happened in the month, approximately a month, that Petitioner remained in the country after that. What if one of the rocks that was thrown on his house had hit him and given him a concussion? Would that have been enough? That may have been. I mean, that would be a different fact that the agency would have to consider. That would perhaps show more than just an act of intimidation. The point is we need to see more than intimidation or harassment. We need to see that these threats are credible, that they're not just idle threats on phone calls that are placed with no actual real-world consequences attached to them. Is there anything in the record to indicate that Petitioner agreed to testify with respect to the robbery? No. I don't think there's anything to that level, Your Honor. It seems that he just gave information to the police. Well, he told his mother he wanted to stay out of it, and his mother called the police, right? I believe he first had a conversation with his stepfather, who advised him not to get involved. I don't remember if he told the friend's parents or if his family told the friend's parents. These are the parents of the person who was robbed. They went to the police, and then the police came to his house and took a statement. Is it correct one of the threats was a death threat? I believe yes. There's a sentence in the BIA opinion that says, here the threats were unfulfilled. Is it the government's position that a death threat doesn't count unless it's fulfilled? No. Our position is, like this court and many other courts, that threats must be sufficiently imminent or concrete or so menacing as to cause significant actual suffering or harm. I understand. But the BIA view was the threats, what they say is, here the threats were unfulfilled, and I'm just wondering if you want to defend the proposition that an unfulfilled death threat doesn't count. As past persecution, no, Your Honor. Really? It must be fulfilled before you can complain? It doesn't need to be fulfilled. It needs to be sufficiently imminent or concrete. They didn't say it's not sufficiently. They said the threats were unfulfilled. They didn't say these not concrete threats were unfulfilled. They said it was unfulfilled, and I'm just wondering if you really want to defend that position. As an abstract matter, yes, unfulfilled threats are not persecution. Of a death threat? Yes, Your Honor. You have to die before you can complain? No. Well, then how does it get fulfilled? It has to be sufficiently imminent or concrete. They didn't say that, though. I can understand insisting it must be concrete. I just want to know, do you wish to defend the BIA's statement, maybe it's a casual line or a throwaway line or an ill-considered line, which you're free to disown if you wish to. But I'm going to be surprised, I'll tell you, if you're going to stand there and say, oh, yes, even an unfulfilled death threat doesn't count. An unfulfilled threat that's not sufficiently imminent or concrete is not persecution. How about an unfulfilled death threat that is specific and concrete? Does that count? Yes, sufficiently imminent or concrete, yes. So let me, if I can, looking at, I was also struck by the language that Judge Newman has just pointed out about unfulfilled threats because it also makes no sense to me. But I heard you say that it doesn't constitute past persecution. Mightn't it still constitute evidence of a well-founded fear of future persecution? Yes. Okay. Yes, it does come into play in terms of the well-founded fear consideration. That is a factor to be considered. So the fact that it was unfulfilled has maybe some bearing on how seriously to take it, but still, if you're getting death threats daily, one might have a well-founded fear of future persecution. Isn't that right? In a general sense, yes. In this case, no. Even though there were the additional aggression and assault on his house and the perpetrators were nearby and the applicant, the petitioner here, testified credibly that he drew the inference from the course of events that the police themselves had informed the perpetrator or the alleged perpetrator of his cooperation and witnessed the testimony he gave so that the police were suspect and the I.J. found that that was credible. Isn't that right? The I.J. did find him credible. He also testified that he was not sure if the perpetrator of the robbery actually saw him. So it's possible that he was seen observing the crime and that's how this criminal gang learned that he was the witness. It was an alternative, but it was an equally reasonable inference to draw that the police actually informed the individuals who then assaulted him. If there are two reasonable inferences, the agency's choice between them is subject to substantial evidence review. It is substantial evidence, and a reasonable alternative does not compel a contrary finding. And what's the government's current position on the applicability of A, B, and whether there was nexus here or not? In terms of nexus, the agency assumed it or made that decision and took it out of play. So in terms of this appeal, it's not really before the court. Now, if the court chooses— So we should treat it as established for purposes of this appeal? Yes, Your Honor. Okay, thank you. Yes, and we only cited a matter of A, B, as my opponent pointed out, for the unable or unwilling matter. Okay, thank you. Judge Sullivan, I have a question for you. So I just want to be clear. There's no evidence in the record that he agreed to testify. Is that correct? That's correct. And is there anything in the record that indicates what the statute of limitations is on a robbery in Peru? No, Your Honor. Not that I have seen. There's nothing about police investigations or how police conduct their business in Peru. Again, all the information we have is the rock-throwing incident happened on November 15th. He was out of the country on December 11th. We have no idea what police did in that interim or— 2011. Correct. Yes, Your Honor. I want to be—I'm sorry. Go ahead. No. I want to be clear of your answer, Judge Carney. When you say the nexus requirement you accept, are you saying that you agree that gang violence, if tolerated or condoned by the police, counts, but in this case it wasn't shown that it was tolerated or condoned? I take no position on the nexus finding other than the agency found there was a nexus here. But does the nexus go to gang violence or police toleration of it? I believe the immigration judge talked about being an informant. I'm not really sure exactly what nexus the immigration judge believed existed. However, that issue was decided and not further litigated. I guess I'm not making myself clear. You agreed that we don't need to remand for reconsideration of whether there's a nexus satisfaction here. Correct. Okay. And I want to know what it is you're agreeing to. Are you only agreeing that gang violence, if tolerated or condoned, counts, or are you agreeing that even if it is tolerated or condoned, that's so in this case? I can't make any statement, Your Honor, about nexus. I thought the BIA's position and the government's position was there's not enough evidence that the police either tolerated or condoned gang violence in this case. Now, are we speaking about nexus or are we speaking about unable or unwilling? I just want to make sure I'm answering Your Honor's question. I don't want to put a label on it. I'm trying to see what you agree in your colloquy. Do you agree still that the BIA takes the position and took it in this case that there wasn't sufficient evidence of police toleration or encouragement of the violence? Isn't that your position? He didn't follow up, he didn't investigate, he didn't testify? Well, the board also cited the specific things the police did in this case as evidence. I think you understandably think I'm giving you a hard time, which is a common feeling among litigants. But I'm trying to understand, is it the government's position that this decision is correct because there's insufficient evidence of either police condonation or encouragement of the violence? Isn't that your position? I think so, Your Honor. I'm not saying even exclusively your position. Isn't that part of your position? I think so. I think if I'm understanding your question correctly. And just to kind of expand on that to sort of show where I'm coming from on that question, yes, there is evidence in the record about police corruption and gang influence and all that, but the agency has cited the specific things that the police did in this case as countering that. And so I don't know that we're looking just at level of corruption or level of influence. We're also looking at the particular facts and things that the police did in this case as countering the more general evidence. So that their bottom line is there isn't enough evidence of police condonation or encouragement of this episode? As a general statement, that sounds correct. But I'm not binding the agency to that. All right. I don't know why you wouldn't. That's their best argument. If that's what Your Honor thinks, we agree with it, yes. And for those reasons, the Court should deny the petition. Thank you. Thank you, Mr. George. Mr. Isaacson. Yes, Your Honor. I think to first briefly turn to that exchange that the government just had with Your Honor, if the government's position is that the only sort of basis to sustain this is that there are the best basis is that there's insufficient. No, no, no. He didn't say only. He was careful not to say only. That's true. Okay. So if part of the reason is the idea that there's insufficient evidence that the government condones, I think that's also the error that the First Circuit pointed to in Rosales-Justo. It's unable or unwilling. They can be unable even if one assumes, although I think counterfactually, that they're willing. And there's abundant background evidence in the OSAC report that I had quoted, in the experts' report, in the country conditions background of their unableness, regardless of whether they're also unwilling, of their inability. Sorry, Your Honor. No, we should just rely on that. In any case involving Peru, we just know the cops are unable to do stuff, and we don't even need to consider it on a case-by-case basis. No, I think we start with perhaps a presumption against them. I think if they had done something clearly effective, one could perhaps say, okay, but this case isn't like that. I keep wondering what you think they could do. I keep wondering what the NYPD would do with a witness who is not prepared to testify and who has only seen one person do a robbery, didn't see anybody throw a rock through his window. And I'm not sure. You think that the NYPD would go out and arrest people based on that? I think, first of all, I don't think the record says he wasn't prepared to testify about the attacks on his house. Does it indicate he was prepared to testify about anything? He went and reported. It didn't get to the point, I think, of there being a judicial proceeding where he could decide to or not, although the friend said he cooperated in all proceedings that did happen. And that's in the record. There wasn't a trial where you could say he got up on the stand or not. But he did cooperate in the proceedings that the police did hold on the robbery. But, yes, I think that if the NYPD was told, you know, I reported that I thought gang member X committed a robbery of my friend's house and then I got death threats and an attack on my house and rocks thrown through my window and people tried to break into my house, that they would then go and take some action in terms of arresting the person who had been part of the robbery and presumably part of the threats as well, since it's the same gang and they're referencing the snitching. I also think, just to address that quote that the government had about I don't know if their interest is gone, he doesn't have to know. Again, the question is, is there a reasonable possibility? Would a reasonable person be afraid? Forthrightly admitting you're not certain exactly how much danger you're in doesn't mean that it wouldn't be reasonable to have a fear. It doesn't mean that this less than 10 percent threshold under Cardozo-Fonseca isn't made. I also think Your Honor's point about what a death threat would have to have to be fulfilled is a very good one. I think even the government conceded that concrete and imminent threats can be past persecution. And I think for the reasons we set out in the brief, this one is. It's very concrete and imminent. It's an actual thwarted attempt where there's an actual attack on the house. In terms of reporting, in Rosales-Giusto and in this Court's decision in Pamphlet— reflect an attempt to kill him? I think they reflect an attempt to break into his house. And when people who are threatening to kill you attempt to break into your house, it may not be exactly clear whether their intent was to kill you or beat you up. I think it's fair to infer if they're threatening you with death and trying to break into your house, they were probably planning on doing something fairly bad if they had gotten in, if they had just wanted to deliver threats. Shouldn't they have just left a note under the door and not tried to break into the house? I don't know. Maybe I'm a victim of my own experience. But it seems to me the Gambinos and other criminal organizations don't generally leave notes. They don't generally make calls. This seems like it's designed to intimidate, to prevent someone from cooperating, not designed to kill. If you only want to intimidate someone, I'm not sure why you attempt to break into their house, which, again, he credibly testified is what they did. This isn't a question like an AEM of a painted threat on a door. I think the fact that there was an actual physical attack with property damage, with an attempt to break into his house, is significant. I don't think we need to prevail on whether it's past persecution, but I think it is. And I think also the government's repeated reference to the substantial evidence standard, whether or not it applies to the other components of the case, where I do think that you have to remand under Rizal and Tianyong Chen for errors of reasoning and errors of perceiving the record even before reaching a final substantial evidence analysis. But on past persecution, this is not a substantial evidence case. According to Merzoyan, whether these given facts establish past persecution is a mixed question of fact and law reviewable de novo. The BIA, the agency, doesn't have to be egregiously wrong on that point. They merely have to be wrong. And we think they are because the government has conceded that concrete and imminent threats, and the courts have held that concrete and imminent threats can be persecution. I think based on the Fourth Circuit and First Circuit case law that we've cited, Crespin, Valladares, Lin, et cetera, death threats at the very least have a sort of lower threshold because they, you know, if a death threat is at all imminent and concrete, as opposed to somebody painted something on your house, one does have the logical problem in seeking to make it more concrete, that as Your Honor pointed out, if one waited until it was fulfilled, the person would be dead. So I think imminent and concrete for a death threat has to be defined in a slightly more relaxed way to avoid that anomaly. And I think that threshold, as in Crespin, Valladares, is met here when you have threats of death accompanied by an actual attack on someone's house, an attempt to break into their house, and rocks thrown as part of that attack that threatened him with death for being a snitch, so that we know that that was the basis of the attack. And I don't think he had indicated, as I say, in any conclusive fashion, that he was unwilling to testify. I think the record shows that he had cooperated to the point that the investigation got and that there wasn't a trial where you could see. And that's different from whether he was initially interested, by the way, Your Honor. I think the point of confusion here may be that, yes, he didn't want to go to the police in the first place to report this robbery. But having done so, he, you know, once it was put to him, you know, we have been told that you're the witness. He did cooperate with them. There is, as I say, because there's discussion in the record about this. If Your Honor would like, I could send a 28-day letter with the exact citation. But I remember there's discussion in the record of it. The record is what's from the hearing, right? Yes, and that's what I'm saying. There's a discussion in the hearing about did you, you know, when you went, when you told the police about this, what does this mean? This paper, you know, the friend says, you know, available procedures or something. And the answer is there isn't a, again, it doesn't go to trial, but he did cooperate with the police in effect insofar as they asked him to. Mr. Isaacson, I think we've, unless one of my colleagues has another question for you, I think we've let you, we've taken plenty of your time. Thank you so much. Thank you both. We will reserve decision.